UNITED STATES of America,
Plaintiff-Appellee,

v.

Amos A. HOPKINS,
Defendant-Appellant.

No. 81–1271.

United States Court of Appeals,
Tenth Circuit.

June 29, 1982.

Rehearing Pending.

Mary E. Bane, of Oyler, Smith & Bane, Oklahoma City, Okl., for defendant-appellant.

John R. Osgood, Asst. U. S. Atty., Oklahoma City, Okl. (David L. Russell, U. S. Atty., Oklahoma City, Okl., was on the brief), for plaintiff-appellee.

Before HOLLOWAY, LOGAN and SEYMOUR, Circuit Judges.

HOLLOWAY, Circuit Judge.

This is a direct appeal by the defendant-appellant Amos A. Hopkins from his convictions on eleven counts of mail fraud (Counts I through XI), 18 U.S.C. § 1341, and one count of conspiracy under 18 U.S.C. § 371 (Count XIV) to commit mail fraud and wire fraud, 18 U.S.C. § 1343. A co-defendant, Clifford Aaron Maston, was charged along with Hopkins on two of the mail fraud counts (Counts I and II) [1] and the conspiracy count (Count XIV), and individually on two mail fraud counts (Counts XII and XIII), under 18 U.S.C. § 1341 and 18 U.S.C. § 2, but Maston was acquitted on all these five counts. Hopkins was sentenced to terms of five years' imprisonment on each of his convictions, the sentences being concurrent.

As grounds for reversal, defendant Hopkins asserts claims that (1) the indictment was fatally defective as to the allegations of the mail fraud counts; (2) the charges and the evidence were insufficient to show a scheme or artifice to defraud; (3) the evidence was insufficient to establish a conspiracy; (4) the indictment and evidence as to counts one through eight in no way showed mailings made in furtherance of a scheme to defraud, as required by § 1341; (5) the trial court erred in refusing to give a good faith defense instruction; and (6) several of the trial judge's rulings on the admission of evidence and the scope of cross-examination, and several of his statements during the course of the trial, prevented defendant from fully presenting his defense and were prejudicial error.

I

Viewing all the evidence, direct and circumstantial, together with all reasonable inferences therefrom, in the light most favorable to the Government as we must on this appeal from a guilty verdict, *United States v. Twilligear*, 460 F.2d 79, 81–82 (10th Cir.), the evidence tended to show the following facts.

In substance Hopkins was charged, along with Maston, with devising a scheme to defraud and to obtain money by inducing numerous persons to pay for services in assisting them in filing a claim for an Indian land allotment.[2] The fee for his assist-

---

**1.** On Counts I and II the charges against Hopkins and Maston were made under 18 U.S.C. § 1341 and 18 U.S.C. § 2.

**2.** The proper method of filing for an Indian land allotment is not before us. However, to facilitate comprehension of the issues presented, a brief overview of the Indian Allotment procedure may be beneficial. In 1887, Congress enacted the General Allotment Act, 25 U.S.C.A. §§ 331 et seq., in order to assimilate Indians and end their tribal and nomadic lifestyle. *Hopkins v. United States*, 414 F.2d 464, 467 (9th Cir. 1969). This act provided a method for both reservation and non-reservation Indians to obtain a land allotment. *See* §§ 1 and 4 of the General Allotment Act of 1887, as amended, 25 U.S.C.A. §§ 331 and 334.

In 1934 the public domain land in the ten western states was withdrawn from settlement and since that time "land in the public domain, may not be disposed of by an Indian allotment until it has been classified [by the Secretary of the Interior] as irrigable, nonirrigable agricultural or nonirrigable grazing land." *Pallin v. United States*, 496 F.2d 27, 29 (9th Cir.); Taylor Grazing Act, § 7, 43 U.S.C.A. § 315(f); *Kale v. United States*, 489 F.2d 449, 452 (9th Cir.), *cert. denied*, 417 U.S. 915, 94 S.Ct. 2617, 41 L.Ed.2d 220; *Finch v. United States*, 387 F.2d 13, 15

(10th Cir. 1967), *cert. denied*, 390 U.S. 1012, 88 S.Ct. 1262, 20 L.Ed.2d 162; *and see* F. Cohen, *Handbook of Federal Indian Law* (1982 ed.), 627 & n.168. The public land located in the State of Nevada is included in that withdrawal and is not subject to settlement under the General Allotment Act unless reclassified.

Thus, a petition for classification is a requirement for receiving an allotment, along with the necessary application for an Indian land allotment, unless the lands described in the application have already been classified and opened for disposition under the regulations. 43 CFR § 1531.2 (1981). Further, the applicant must attach to his or her allotment application a certificate that he or she is an Indian and eligible for an allotment. When the allotment is approved, a certificate of allotment is issued and the Indian may then enter on the lands. The issuance of a trust patent is suspended for two years to permit the Indian allottee to demonstrate his good faith and intention in the matter of his settlement, unless such requirement is already satisfied. 43 CFR § 2532 (1981).

The trial court instructed the jury as to the correct method of filing. (XI R. 1365–67). We note that one of the three cases relied on by the trial judge as authority for the proper method of filing was *Hopkins v. United States, supra,*

ance varied from approximately $100 to $125 per claim. Defendant is charged in each mail fraud count with knowingly making false representations to obtain money. He allegedly represented that by submitting a specific form (claim form)[3] to the Clark County, Nevada, Recorder's office an individual could obtain up to 160 acres of public domain land in Nevada to be used for various purposes. He is said to have represented that by virtue of their Indian descent they had a right to the Nevada lands and that the right to the land allotments was provided for by various sections of the United States Code, Indian treaties, and case law. (IX R. 392–93; X R. 947–49; Def.Exhs. 21–26, 28 and 598).

Hopkins and Maston provided land descriptions for the claim forms and instructed the claimants that the forms must be accompanied by a thumbprint and a nominal recording fee. Finally, Hopkins provided a Clark County, Nevada, Recorder's address to which the claim forms were to be mailed in some instances advising use of certified mail. He represented that after the claim was filed the claimant would have some rights in the land, these representations varying as to different claimants. (*E.g.,* XI R. 46, 300).[4]

In 1977 the Clark County, Nevada, Recorder's office began receiving the claim forms. As of December 1980, the time of trial, the Recorder's office had received between 1500 and 1800 such forms. Over 400 of these claims were admitted in evidence.

(*See e.g.,* V R. containing 386 claims; Pl. Exhs. 6–9). The claims contained the same information, included a land description, and were accompanied by a small recording fee.[5]

Maston, the acquitted co-defendant, identified numerous Western Union telegraphic money order receipts of money sent by him to Hopkins in Nevada, California, and Texas. Some of the receipts indicate that the money was sent to Hopkins via teller's cages in gambling casinos in Las Vegas. (*E.g.,* Def.Exhs. 56–58 and 73). The total amount sent was in excess of thirty-two thousand dollars. (X R. 993). Maston also deposited nearly three thousand dollars in a bank account in Hopkins's name. (Def. Exhs. 110–114).

Government witness Roger Jarrell, an employee of the Bureau of Land Management (BLM) in Nevada, testified as to the status of the land that some of the claimants had filed for pursuant to Hopkins's guidance. His testimony indicated that, contrary to Hopkins's representations, the land was either unavailable for Indian land allotments until it was reclassified, or was patented to other persons. The land claimed by four of the claimants (Counts I, VII, IX, and XI) had been patented into private ownership as early as 1961 and was thus unavailable for Indian land allotments.[6] Jarrell's testimony also related the status of three other claimants (Counts III, IV, and VI) and revealed that, at the least, the land was classified for retention and

---

Hopkins there being the same party as the defendant herein. (XI R. 1274, 1391).

3. All claim forms in evidence were headed as follows:

NOTICE OF INDIAN ALLOTMENT SELECTION, LOCATION, POSTING OF NOTICES, CLAIM OF INDIAN TITLE THERETO INCLUDING ALL WATER MINERAL RIGHTS AND LAND AS WELL AS TAX EXEMPTIONS AND OTHER RIGHTS PECULIAR TO INDIVIDUAL INDIAN OWNED LANDS...

4. Generally, the claimants were admonished not to sell the property but to lease or move onto it. However, some were told that, after filing the claim form they could sell the acreage. (*See e.g.,* IX R. 300–301 and 460; *cf.* X R. 779).

5. The claim forms reveal few distinctions. They were identical with the exception of dissimilar land descriptions, diverse claimants' names and addresses, and occasional insertion of different hand-written statutory citations. One of such claim forms, relating to Count II, appears in the Appendix to this opinion.

6. The land claimed by the victim of Count 1, Bernard Bourgo, was patented in 1961. Lands claimed by the victims of Counts VII, IX, and XI, Raylene Wood Lee, Jewel Laverne Stroud Pickle, and Billy and Ann Stroud, respectively, was patented in 1971 and was similarly unavailable for Indian land allotments. (IX R. 496; Pl.Exhs. 43–A and 29–A).

would require a petition for reclassification in order to be available for an Indian land allotment.[7]

Other testimony revealed that Hopkins sometimes gave the same legal description to different claimants. (IX R. 435). Hopkins also testified as to his familiarity with *Hopkins v. United States*, 414 F.2d 464 (9th Cir.) (*see* n.2, *supra* ), *Kale v. United States*, 489 F.2d 449 (9th Cir.), *cert. denied*, 417 U.S. 915, 94 S.Ct. 2617, 41 L.Ed.2d 220 and *Finch v. United States*, 387 F.2d 13 (10th Cir.), *cert. denied*, 390 U.S. 1012, 88 S.Ct. 1262, 20 L.Ed.2d 162, all of which in part address the proper method of filing for an Indian land allotment.

Hopkins vigorously denied any fraud or misrepresentation. He testified at length explaining his belief that *Hopkins v. United States, supra*, did not decide the issues he was fighting for—namely, the right of every Indian "to pursue his remedy under 25 U.S.Code 345, 346" and for the Indians' rights under 25 U.S.C. § 415 which he claimed "... allowed Indian land, either tribally or individually owned, to be used for grazing purposes, for agricultural purpose, where a sizeable investment would have to be made, or for housing development, recreational development, religious purposes, or any other purpose." (XI R. 1,211). Hopkins testified that the first thing he determined when assisting someone in filing for an Indian land allotment was whether or not the person was of Indian descent, and that a Certificate of Eligibility or Entitlement was not required but was conclusive evidence of the right to an allotment. (XI R. 1,224). He also claimed that the right to a land allotment "is a pre-existing right." (*Id.*).

Further, Hopkins testified that it was his belief that filing the claim form in Clark County, Nevada, served as notice of an Indian allotment selection, that it was a method of establishing constructive settlement on the land (XI R. 1,227, 1,238), and that the Taylor Grazing Act did not affect the right to Indian land allotments since that right is a "vested right" and the Act "does not allow the Secretary [of the Interior] ... to restrict, diminish or impair any vested right." (XI R. 1,247). Consistent with this position, Hopkins stated that the withdrawal of the ten Western States from settlement, effected by Executive Order in 1934, was only temporary.[8] Additionally, Hopkins claimed that the money obtained by him for his assistance in filing claim forms was used generally by the Tribal Indian Land Rights Association (TILRA), 85% being for charitable purposes and some for his livelihood.

Additional evidence will be detailed as necessary in discussing Hopkins's appellate contentions.

## II

### *Sufficiency of the indictment*

Defendant urged the insufficiency of the indictment by a pretrial motion. (I R. 20–29). The motion was overruled. On appeal, Hopkins reasserts the contentions made in his pretrial motion, namely, that the indictment was insufficient as to Counts I through XI, both to apprise him of what he had to be prepared to meet at trial and to support a plea of former acquittal or conviction. (Opening Brief of Defendant, 30).

More specifically, defendant Hopkins argues that mail fraud Counts I through

---

7. One hundred acres of the land claimed by Mary Ellen Fout Allread, the alleged victim of mail fraud Count III, had been previously patented and the remaining 60 acres were not available for Indian land allotment unless reclassified. (IX R. 480; Pl.Exh. 1–b). All the land claimed by Vickie Dodd, the alleged victim of mail fraud Count IV, was unavailable for land allotment unless reclassified. (IX R. 493; Pl.Exh. 15–C). The alleged victim of mail fraud

Count VI, Oleta June Watts Paxton, filed two claims. All but 27.5 acres in her first claim had been patented and was unavailable. The 27.5 acres were unavailable unless reclassified. (IX R. 483; Pl.Exh. 41–A). The status of her second claim is unclear from the record. (IX R. 483).

8. *See* note 2, *supra*, discussing case law on these points.

VIII [9] lack the specificity needed to prepare for trial since the Government failed to distinguish those specific mailings from the more than 1,800 mailings the evidence indicated. Defendant claims that even the specific name of the victim found in each count was unhelpful as there was no charge that that victim mailed the document(s) nor was there any way that Hopkins could determine when the mailings were made unless he was notified of them. Hopkins likewise contends that mail fraud Counts IX through XI are vague and fail to apprise him of what he must be prepared to meet at trial since the charges do not reveal the identity of the drawers of the checks or explain the victim's connections to the allegations.

■ The general rules for determining the sufficiency of an indictment are well settled. The Sixth Amendment provides that "the accused shall enjoy the right ... to be informed of the nature and cause of the accusation." In *Russell v. United States*, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240, the Supreme Court set forth the essential criteria for measuring the sufficiency of an indictment. First, it must contain the elements of the offense and sufficiently apprise the defendant of what he must be prepared to meet. Second, in case of further proceedings against him for a similar offense, the record must show with accuracy to what extent he may plead a former acquittal or conviction. *Id.* at 763-64, 82 S.Ct. at 1046-1047. In determining the sufficiency of an indictment challenged as being vague and indefinite, the whole of the indictment must be taken into consideration. *United States v. Crummer*, 151 F.2d 958, 962 (10th Cir.), *cert. denied*, 327 U.S. 785, 66 S.Ct. 704, 90 L.Ed. 1012. If the indictment is sufficient but further specification is desired, the remedy is to apply for a bill of particulars. *Id.* at 963.

Count I charges in detail a scheme to defraud and in the third paragraph it

charges a mailing for the purpose of executing the scheme, alleging the victim and an approximate date of causing a letter and a type of enclosed document for the Nevada recorder's office to be placed in an authorized mail depository. Counts II through VIII incorporate the Count I allegations of a scheme and artifice to defraud and they further likewise allege a victim's name and, for the purpose of executing the scheme, the approximate date of causing a letter and the same type of document to be placed in an authorized depository for mail matter addressed to the Nevada recorder's office. Counts IX through XI incorporate the allegations of Count I of a scheme to defraud and they allege a victim's name and that, for the purpose of executing the scheme, on or about a given date defendant took a letter and a check of an approximate amount from a depository for mail matter.

■ We hold that the charges as alleged in Counts I through XI of the indictment are sufficient and not indefinite as claimed.

### III

*Sufficiency of the charges and evidence of the scheme to defraud*

Defendant Hopkins next contends that the charges made in the indictment and the evidence were insufficient with respect to demonstrating a scheme or artifice to defraud, as required by 18 U.S.C. § 1341, and as alleged by the indictment.

Generally the indictment alleged that the scheme to defraud existed from on or about August 1, 1977, to on or about April 30, 1979 in the Western District of Oklahoma and elsewhere. It further charged that the purpose of the scheme was to obtain money by means of false representations to persons, primarily of Indian descent, that they were eligible for lands in Nevada. The indictment set forth numerous representations, allegedly made by the defendant, as part of the scheme.

---

**9.** We note that Counts I through VIII charge that, for the purpose of executing the scheme, defendant Hopkins caused individuals to place letters in authorized mail depositories, while Counts IX through XI charge him with taking and receiving letters, containing checks, from authorized mail depositories.

At trial the Government's evidence tended to show a scheme in which Hopkins led people, generally of Indian descent, to believe that by virtue of their Indian ancestry they were entitled to an allotment of public domain land and that by the filing of a claim with the Clark County, Nevada, Recorder's office they would have some rights in the land, which rights were variously stated. Hopkins told the claimants to sign and thumbprint the claim forms before a notary public, to enclose a money order in order to cover the cost of recording the instrument, and to mail the claim to the Recorder at the Clark County, Nevada, courthouse in Las Vegas, Nevada. *See* Appendix. In addition Hopkins, or other persons working for him, provided the legal descriptions for the claimed property. The claims generally described 160 acres.

Hopkins represented that this entitlement was created by the General Allotment Act of 1887 and recognized by case law and various Indian treaties. (Def.Exh. 598; IX R. 392–93; X R. 947–49). He cited various sections of the United States Code as authority for the method he advised. Citations to most of this authority are found in the body of the claim forms.

▄▄▄▄ Hopkins indicated that if these basic steps were taken, the claimants had rights in the land. Claimants Allread and McPherren (Counts III and VIII) testified that Hopkins told them that the filing of the claim forms gave them the right to sell the property. (IX R. 300–301 and 460). Seven other claimants testified that Hopkins said that the filing would give them

the right to lease the property. (IX R. 46, 72, 394, 368, 443–44, 99, and 212). Hopkins informed some that the filing allowed them to do anything with the land but sell it. (IX R. 46, 394). Two of the victims of the eleven mail fraud counts testified that Hopkins indicated that their rights in the land would not be absolute until other procedures were completed. These two, R. C. Jackson, Jr. (Count V) and Raylene Wood Lee (Count VII), testified that Hopkins stated that in addition to the claim forms, Certificates of Entitlement would be required. (IX R. 421, 443–44). However, Hopkins told Jackson that the filing alone did give him the right to move onto the land. Thus the claimants in ten of the eleven mail fraud counts in which Hopkins was charged were advised that by filing the claim form which Hopkins provided they would obtain some degree of possessory rights in Nevada land.[10]

Hopkins charged from $100 to $125.00 per claim for his assistance in the filing procedure. The evidence included receipts totalling $32,017.45 (X R. 993) worth of money orders telegraphed to Hopkins by Maston while Hopkins was away from Oklahoma, as well as records of nearly three thousand dollars' worth of deposits by Maston in a bank account in Hopkins's name. (Def. Exhs. 110–114). Hopkins testified that 85% of the money was used "for charitable purposes." (XI R. 1,292 and 1,317). He also claimed that the fee was "used to keep the activities of the Tribal Indian Land Rights Association moving" (XI R. 1,250) and for his "livelihood." (XI R. 1,252).[11]

---

10. The purpose of the mail fraud statute is to prevent the use of the mails in furtherance of schemes to defraud. *Parr v. United States*, 363 U.S. 370, 389–90, 80 S.Ct. 1171, 1182–83, 4 L.Ed.2d 1277. Though we have studied the record as to the claimants in all eleven mail fraud counts, we note that the actual defrauding of a particular victim is not crucial to a successful prosecution. *United States v. Buchanan*, 633 F.2d 423, 427 (5th Cir.), *cert. denied*, 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 301; *United States v. Keane*, 522 F.2d 534, 545 (7th Cir.), *cert. denied*, 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746; *United States v. Bloom*, 78 F.R.D. 591, 607 (E.D.Penn.).

11. The Tribal Indian Land Rights Association (TILRA) is an unincorporated association formed by Hopkins around 1963. (XI R. 1,180). Defendant defined the TILRA as "an Indian rights organization." (*Id.*). The TILRA apparently does not maintain an office, have officers of any kind, or have any formal restrictions as to who may be affiliated with it. When Hopkins was asked about the staff of the TILRA, he said (XI R. 1284):

> Wherever I am it's staffed by me.
>
>    *   *   *   *   *   *
>
> Wherever a member is, it's staffed by them.
>
>    *   *   *   *   *   *

The defendant's position is that he suggested the claim procedure in good faith, believing that the claimants would eventually obtain the lands for which the papers were filed. Hopkins often told claimants that the issue may finally be resolved by the Supreme Court. (*See e.g.*, Def.Exh. 598; XI R. 1,244). He maintained that the propriety of the filing method which he had outlined had not yet been determined by the courts. Furthermore Hopkins testified that he was aware of the method which the prosecution said was proper.

Hopkins testified that he was involved in *Hopkins v. United States*, 414 F.2d 464 (9th Cir.). The *Hopkins* case held, *inter alia*, that the Secretary of the Interior was authorized under the General Allotment Act to withdraw public lands from settlement and subsequent to the withdrawal, in 1934, of the ten western states from settlement, entry and settlement was conditioned upon a prior classification of lands as suitable for allotment. *Id.* at 471, 472–73. Hopkins also testified as to his awareness of *Kale v. United States*, 489 F.2d 449 (9th Cir.), *cert. denied*, 417 U.S. 915, 94 S.Ct. 2617, 41 L.Ed.2d 220. There the court, noting dismissal of a protest filed by Hopkins concerning the prior issue of a patent to lands applied for by Kenneth M. Kale by an Indian land allotment application, said "[t]he protest was dismissed ... for the reason that settlement under § 4 of the General Allotment Act was not available to an Indian *until authorized by classification*. The selection by an Indian carried no right to a particular tract of land." *Id.* at 452, n.4. (Emphasis added). *Kale* also held that settlement on a tract of land applied for by an Indian allotment application had to be authorized by classification, and that settlement prior to classification constituted trespass. *Id.* at 453. On cross-examination, Hopkins acknowledged familiarity with *Finch v. United States*, 387 F.2d 13 (10th Cir.), *cert. denied*, 390 U.S. 1012, 88 S.Ct. 1262, 20 L.Ed.2d 162. In *Finch*, this court recognized that Indians do not have a vest-

ed right to the land of their choice, that the public lands in the ten western states were withdrawn from settlement, and that the lands must be reclassified before settlement. *Id.* at 15.

■ We conclude that the charges of a scheme to defraud were adequately alleged in the indictment. Further, we are satisfied that the direct and circumstantial evidence as a whole, together with reasonable inferences which the jurors might draw from it, furnishes adequate support for a finding of guilt beyond a reasonable doubt as to the scheme to defraud alleged in the indictment, in violation of 18 U.S.C. § 1341. The representations as to the effect of the filings with the Nevada recorder's office could clearly be found to have been fraudulent and the basis for a scheme to obtain large sums of money for defendant Hopkins.

## IV

### Conspiracy

Defendant Hopkins argues that the evidence was insufficient to support his conspiracy conviction in light of the acquittal of the only named co-conspirator on the conspiracy charge and the lack of evidence of conspiracy with any other person.

Count XIV charges that Hopkins, Maston, and others not named, conspired to commit mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively, all in violation of the conspiracy statute, 18 U.S.C. § 371. Defendant Hopkins argues that the evidence was insufficient to establish a conspiracy. He admits that the acquittal of one of two named co-conspirators does not require acquittal of the other if, as here, the indictment charges that there were other unnamed co-conspirators and if there is sufficient evidence to establish that the defendant conspired with one or more of the unnamed co-conspirators. However, Hopkins argues that there was

All Indians that want to be affiliated with the Tribal Indian Land Rights Association are

considered affiliated with them.

not only an acquittal of the only named co-conspirator, Maston, but also that the evidence was insufficient to support a conviction based on Hopkins's conspiracy with any other person. (Brief of Appellant at 28–29).

The Government makes three responses. First, it says that the record as a whole supports the theory that defendant Hopkins conspired with an unnamed co-conspirator since numerous acts took place in furtherance of the scheme to defraud which bore Hopkins's stamp, but which he could not have done alone because of the circumstances. (Brief of Plaintiff-Appellee at 9). The Government's brief argument on the point makes no reference to any record evidence and cites no instance from which an inference of an agreement to conspire with any unnamed person could be drawn. The essence of the crime of conspiracy is an agreement to violate the law; mere knowledge or approval of or acquiescence in the object and purpose of a conspiracy, without an agreement to cooperate in achieving such object or purpose, does not make one a party to a conspiracy. *United States v. Butler*, 494 F.2d 1246, 1249 (10th Cir.). The argument of the Government would ground the conspiracy conviction of defendant Hopkins on speculation. To convict a defendant the evidence must do more than merely raise suspicion or the possibility of guilt and the evidence is simply insufficient to prove beyond a reasonable doubt that Hopkins conspired with an unnamed third person. *United States v. Blunk*, 561 F.2d 111, 116 (8th Cir.).

Second, the Government argues that the conspiracy conviction can be based on the theory that defendant Hopkins conspired with Maston, despite his acquittal. The argument is that the conspiracy count survived a motion for acquittal at the close of the Government's case, that the trial court viewed Maston as a principal and co-con-

spirator by a preponderance of the evidence, and that if two persons are accused of conspiracy and the record supports the conclusion that one is guilty beyond a reasonable doubt of entering into an agreement, and the other by a preponderance of the evidence of entering such an agreement, the acquittal of the latter will not be grounds for reversal of the conviction of the former, citing *Standefer v. United States*, 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689. (Brief of Plaintiff-Appellee at 9).

[11] We must reject the Government's argument. The *Standefer* case merely held that the conviction of an aider and abettor is not barred by the fact that in an earlier prosecution the principal was acquitted by a different jury. The Court refused to apply a nonmutual collateral estoppel against the Government. *Id.* at 21–25, 100 S.Ct. at 2006–08. The case does not support the Government's argument here. With respect to Maston, it was determined by the jury in *this* case that Maston did not take part in the conspiracy charged. We are convinced that, consistently with *Standefer*, the determination of non-conspiracy by Maston is a determination that does operate in Hopkins's favor and precludes reliance on the theory that there was a conspiracy between Hopkins and Maston. No collateral estoppel is involved. Thus the theory of conspiracy between Hopkins and Maston is barred by the jury's determination, in this case, that it was not shown beyond a reasonable doubt that Maston took part in a conspiracy with Hopkins.[12] Since only the two defendants were indicted on the conspiracy charge, and as noted earlier there was no evidence implicating anyone else as a co-conspirator, the acquittal of Maston requires the acquittal of Hopkins. *See United States v. Gordon*, 242 F.2d 122, 125 (3d Cir.), *cert. denied*, 354 U.S. 921, 77 S.Ct. 1378, 1 L.Ed.2d 1436.

12. We are here dealing with the theory that Hopkins and Maston conspired as a basis for supplying, for Hopkins's own conspiracy conviction, the essential element of an agreement with another to violate the law. *United States v. Butler, supra*, 494 F.2d at 1249. The sugges-

tion that on some analysis this essential element of the criminal conspiracy charge against Hopkins may be established on a standard of proof less than beyond a reasonable doubt is clearly untenable. *See In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368.

Third, the Government argues that in any event the conspiracy conviction should not be set aside but should be upheld under the concurrent sentence doctrine. In view of the difference between the conspiracy offense and the substantive offenses, we decline to apply the doctrine here and conclude that we should decide the validity of defendant's conspiracy conviction. *See United States v. Montoya*, 676 F.2d 428, 433 (10th Cir., 1982).

For the reasons stated, we find no support in the record for the defendant's conspiracy conviction and accordingly reverse the conviction on Count XIV.

## V

### The mailings

Defendant Hopkins challenges his convictions on mail fraud Counts I through VIII on the ground that the mailings of the claim forms to Nevada were made after he had received the claimants' money and thus were not in furtherance of the alleged scheme, as required by § 1341. He says the mailings were not in the nature of lulling letters used as a means of concealing a fraud and that in fact they had the opposite effect and raised questions at the Nevada recorder's office, which contacted the BLM and the FBI.

The issue was presented to the trial judge and he rejected this contention, stating that the scheme called for use of the mail, according to the Government's evidence. (X R. 693). We agree with the trial court's conclusion.

Under the mail fraud statute the mailing must be for the purpose of executing the scheme, as the statute requires, although it is not necessary that the scheme contemplate the use of the mails as an essential element. *United States v. Maze*, 414 U.S. 395, 400, 94 S.Ct. 645, 648, 38 L.Ed.2d 603. "It is sufficient if in fact the mails were used to carry out the scheme and if the use of the mails by a participant or another was reasonably foreseeable." *United States v. Curtis*, 537 F.2d 1091, 1095 (10th Cir.), *cert. denied*, 429 U.S. 962, 97

S.Ct. 389, 50 L.Ed.2d 330. The question is "... whether these mailings were sufficiently closely related to [defendant's] scheme to bring his conduct within the statute." *Maze, supra*, 414 U.S. at 399, 94 S.Ct. at 648.

We conclude that the evidence was sufficient to bring the offenses charged in Counts I through VIII within § 1341. Hopkins represented that the victim claimants would have some right in the land after the claim form was filed in Nevada. He provided the claimants with the Nevada address and suggested that the form be mailed. All of the claimants involved in the Counts in question *mailed* the forms. Thus it could be found that the mails were in fact used to carry out the scheme and that use of the mails was reasonably foreseeable. *United States v. Curtis, supra*, 537 F.2d at 1095. This was enough.

## VI

### Instruction on the good faith defense

Defendant vigorously argues for reversal on the proposition that the trial court erred by refusing to give the jury a good faith defense instruction. He says that he requested such a charge by his requested instructions numbers six and seven, that a review of the evidence shows that a good faith instruction was warranted as a theory of defense, and that good faith is a complete defense to a mail fraud prosecution. Defendant thus urges reversal, citing our opinions in *United States v. Westbo*, 576 F.2d 285 (10th Cir.), *Sparrow v. United States*, 402 F.2d 826 (10th Cir.), *Steiger v. United States*, 373 F.2d 133 (10th Cir.), and *Beck v. United States*, 305 F.2d 595 (10th Cir.), *cert. denied*, 371 U.S. 890, 83 S.Ct. 186, 9 L.Ed.2d 123.

Good faith is a defense to charges of mail or wire fraud. *United States v. Westbo, supra*, 576 F.2d at 288. A defendant in a criminal case is entitled to adequate jury instructions on his theory of defense, provided that there is evidence to reasonably support such a theory. *Beck v. United States, supra*, 305 F.2d at 599. The

trial court has a responsibility to instruct on the fundamental issues, even if a specific instruction is not requested on a particular issue. However, the sufficiency of the instructions may not be determined by the giving or the failure to give any one or more instructions; to make this determination the instructions must be viewed as a whole. *Id.* at 599.

It would have been preferable, after detailing the charges in the indictment, for the instructions to have gone beyond saying that defendants had pled not guilty and that the Government had the burden of proof beyond a reasonable doubt of the essential allegations, (XI R. 1364); it is proper to outline the defendant's position presented by his evidence. Nevertheless, because of the explanations that were given in the charge, we find no reversible error. As in the *Westbo* case, we are persuaded that although the words "good faith" were not used, the instructions as a whole adequately advised the jury about the defendant's good faith theory of defense. A defendant has no right to have any instruction on the good faith issue given in the

particular form he desired, or with any special emphasis. *United States v. Westbo, supra,* 576 F.2d at 289; *United States v. Rothman,* 567 F.2d 744, 752 (7th Cir.).

The defendant's requested instructions six and seven dealt with his theory of good faith as a defense.[13] They, in fact, indicated a close relationship between defendant's good faith theory and mere mistakes as opposed to fraudulent intent and acting knowingly. Requested instruction No. 6 stated that "[o]ne who acts with honest intention is not chargeable with fraudulent intent" and again that "... to establish fraudulent intent on the part of a person, it must be established that such person knowingly and intentionally attempted to deceive another." Defendant's requested instruction No. 7 stressed the points that "... individuals are not punished criminally for mere mistakes, mere mismanagement, mere carelessness or mere errors of judgment. They are punished only for intentional wrongdoing."

The charge given by the trial court covered the same essentials.[14] The instructions

---

**13.** Defendant's requested instruction No. 6 read as follows (I R. 50):

Fraudulent intent is one of the essential elements of the offenses with which the defendants are charged. Fraudulent intent is not presumed or assumed; it is personal and not imputed. One is chargeable with his own personal intent, not the intent of some other person. Bad faith is an essential element of fraudulent intent. Good faith constitutes a complete defense to one charged with an offense of which fraudulent intent is an essential element. One who acts with honest intention is not chargeable with fraudulent intent. One who expresses an opinion honestly held by him, or a belief honestly entertained by him, is not chargeable with fraudulent intent even though such opinion is erroneous and such belief is a mistake in judgment or an error in management, or was careless, does not establish fraudulent intent. In order to establish fraudulent intent on the part of a person, it must be established that such person knowingly and intentionally attempted to deceive another. One who knowingly and intentionally deceives another is chargeable with fraudulent intent notwithstanding the manner and form in which the deception was attempted.

Defendant's instruction No. 7 read as follows (I R. 51):

A man may be visionary in his plans and believe they will succeed, and yet, in spite of their ultimate failure, be incapable of committing conscious fraud. Human credulity may include among its victims even the supposed imposter.

Under our system of laws individuals are not punished criminally for mere mistakes, mere mismanagement, mere carelessness, or mere errors of judgment. They are punished only for intentional wrongdoing. The defendants here are not on trial for errors of judgment or mistakes or mismanagement, but are on trial for a criminal offense, and an essential element of that offense is an evil or criminal intent, which it is incumbent upon the government to prove to your satisfaction and beyond a reasonable doubt before you will be warranted in returning a verdict of guilty.

**14.** The relevant portions of the charge given were as follows (XI R. 1,368–69, 1,369, 1,376–77):

A statement or representation is false or fraudulent within the meaning of this Statute, if known to be untrue, or made with reckless indifference as to its truth or falsity, and made or caused to be made with the intent to deceive.

stated that "[t]o act with intent to defraud means to act knowingly and with specific intent to deceive." (XI R. 1369). In addition, the court instructed that the acts charged in the indictment were " . . . alleged to have been done knowingly and willfully by the Defendants." (XI R. 1376). Further the charge stated that "[a]n act is knowingly done if done voluntarily and intentionally and not because of mistake or accident or other innocent reason." Lastly we note that the court explained that "[t]he purpose of adding the word knowingly was to insure that no one would be convicted due to mistake or accident or other innocent reason." (XI R. 1377).

Under these instructions the defendant's theory of the case could be adequately considered. If defendant's statements to the claimants in Counts I through XI were made due to mistake or accident or other innocent reason, they were told that conviction was not proper. And the jurors were told that an intent to commit each crime charged was an essential element to be proved beyond a reasonable doubt. (XI R. 1376).[15] As in *Westbo, supra*, 576 F.2d at

> A false or fraudulent representation may be made by statements of half truths or the concealment of material facts, as well as by affirmative statements or acts.
>
> A scheme by Defendants to obtain money from persons as part of a process to secure Indian allotments for such persons when Defendants knew that the process would not result in allotments comes within the meaning of the term scheme or artifice to defraud or for obtaining money by means of false or fraudulent pretenses, representations, or promises as used in the foregoing statements.
>
> To act with intent to defraud means to act knowingly and with specific intent to deceive.
>
> The items mailed or received need not themselves disclose any intent to defraud, nor show on their face that they were mailed or received in furtherance of a scheme or artifice to defraud or for obtaining money by means of false or fraudulent pretenses, representations or promises. But it is necessary that the evidence in the case establish beyond a reasonable doubt that the items were willfully mailed, or caused to be mailed, or received by the Defendants with the intent to help carry out some essential step in the execution of a scheme or artifice to defraud or for obtaining money as alleged in the Indictment.
>
>     \*   \*   \*   \*   \*   \*
>
> You will note that the acts charged in the Indictment are alleged to have been done knowingly and willfully by the Defendants.
>
> An act is knowingly done if done voluntarily and intentionally and not because of mistake or accident or other innocent reason. The purpose of adding the word knowingly was to insure that no one would be convicted due to mistake or accident or other innocent reason.
>
> An act is willfully done if done voluntarily and intentionally, and with the specific intent to do something the law forbids, that is to say, with bad purpose to disobey the law.
>
> You are instructed that an intent to commit each of the crimes set forth in the Indictment in this case is an essential element of each of said offenses with which a Defendant is charged, and the burden is upon the Plaintiff to establish such intent to your satisfaction beyond a reasonable doubt.
>
> In this connection, you are instructed that the intent with which an act is done is a mental state of the mind of the accused. Direct and positive proof of intent is not necessary but the same may be and usually is proved by circumstantial evidence. If you find that an act was done, the intent with which it was done is to be determined by you from all the facts and circumstances as shown by the evidence presented in this case.
>
> The crimes charged in this case are serious crimes which require proof of specific intent before a Defendant can be convicted. Specific intent, as the term implies, means more than the general intent to commit the act. To establish specific intent the Government must prove that a Defendant knowingly did an act which the law forbids, or knowingly failed to do an act which the laws requires, purposely intending to violate the law. Such intent may be determined from all the facts and circumstances surrounding the case.
>
> Intent and motive should never be confused. Motive is what prompts a person to act, or fail to act. Intent refers only to the state of mind with which the act is done or omitted.
>
> Personal advancement and financial gain are two well recognized motives for much of human conduct. These motives may prompt one person to voluntary acts of good, another to voluntary acts of crime.
>
> Good motive alone is never a defense where the act done or omitted is a crime. So, the motive of an accused is immaterial except insofar as evidence of motive may aid determination of state of mind or intent.

**15.** It is true that in *Steiger v. United States, supra*, 373 F.2d at 136, this court reversed for failure to give an instruction which fairly, clearly and fully submitted the defense of good faith,

289, we conclude that the jury was given the necessary legal concepts and that the charge adequately advised the jury about defendant's theory of defense.

██ Defendant complains particularly about the portion of the charge which stated that "good motive alone is never a defense where the act done or omitted is a crime." (XI R. 1377). He then points to the statement in *Westbo*, at 289, that "[w]e note that good faith is the obverse of bad motive or intent to defraud." Despite an apparent contradiction in the usage of "motive", in context we find no reversible error. The concluding paragraphs of that portion of the charge given here point out that motive of personal advancement and financial gain may prompt good conduct by one person, but may lead another to voluntary acts of crime. In that sense the instruction given here correctly pointed out that good motive alone is never a defense when the act done is a crime.

We are satisfied from an examination of the instructions as a whole that there was an adequate charge which permitted fair consideration of the defendant's theory and which correctly pointed out the Government's burden of proof beyond a reasonable doubt of the essential elements of the mail fraud charges.

## VII

Defendant Hopkins further claims error in numerous rulings by the trial court on the scope of cross-examination, the admission of evidence, and in several statements made through the trial that the court would instruct on the law applicable to the procedures for filing in connection with Indian land allotments.

We are satisfied there was no error in the rulings challenged or in the scope of cross-examination allowed. Moreover the court's charge on the proper filing procedures was in accord with our understanding of the law, see note 2 *supra*, and the trial judge's statements that he would be giving these instructions were not improper or prejudicial.[16]

## VIII

In sum, we conclude that the judgment should be and it is affirmed as to the convictions on Counts I through XI; the conviction and sentence on Count XIV are reversed and that Count is remanded for entry of a judgment of acquittal.

---

even though general instructions on wilfulness, unlawful intent, specific intent, untruth of a representation, fraudulent statement, etc., were given. *Accord, United States v. Goss*, 650 F.2d 1336, 1344–45 (5th Cir.). In *Steiger*, the scope of the instructions was held inadequate to cover a theory of good faith to carry out a particular business venture. From the full content of the charge here, as from the details spelled out and held sufficient in *Westbo*, we are satisfied the essentials were covered by the trial court sufficiently as to good faith in the representations on filing procedures, etc., asserted here by defendant Hopkins.

16. In this argument, Hopkins cumulates the effect of the court's instructions with his complaints concerning the trial judge's rulings on the admissibility of evidence, limitations on cross-examination, and the trial judge's statements. We consider the instructions separately in Part VI, *supra*. We hold that the complaints viewed separately or together do not call for reversal.

APPENDIX

BOOK 942

WHEN RECORDED MAIL TO:

9 ?1139

VICKIE LYNN FOLSOM LAMB
ON BEHALF OF MINOR SON
LEONARD SCOTT LAMB
120 SW 5TH ST
MOORE OKLA 73160

SPACE ABOVE THIS LINE RESERVED FOR RECORDER'S USE

NOTICE OF INDIAN ALLOTMENT SELECTION, LOCATION, POSTING OF NOTICES, CLAIM OF INDIAN TITLE THERETO INCLUDING ALL WATER MINERAL RIGHTS AND LAND AS WELL AS TAX EXEMPTIONS AND OTHER RIGHTS PECULIAR TO INDIVIDUAL INDIAN OWNED LANDS 25 USC 331-334-345-346-415; 8 U.S.C. 1401 - ETC.

This is to certify that I, VICKIE LYNN FOLSOM LAMB FOR LEONARD SCOTT LAMB, am an American Indian of the CHICKASAW (8 USC 1401) tribe, and as a descendent thereof I am entitled as such to take an Indian allotment of federal public domain or national forest lands pursuant to:

43 U. S. Code 190 (Act of July 4, 1884, c 180, sec. 1, Stat. 96); 43 U. S. Code 189( Act of March 3, 1875, c 131 and 15, 18 Stat. 470);Section 4 of the Act of February 8, 1887 ( 24 Stats. L., 388) as amended by the Acts of February 28, 1891 (26 Stats. L., 794), and the Act of June 25, 1910 ( 36 Stats.L.,855 - et seg where applicable and in pari materia with my tribe's treaty commitments with the United States of America) said rights being reserved to me under the Indian Citizenship Act because of my Indian descent under the Act of June 2, 1924 (43 Stat. 253); See: 8 USC 1401; 25 USC 334, 345, 346,190, 337; 43 USC 190, 189, etc.

Notice and claim is hereby given that entitlement under the aforesaid laws include the 25 year tax exempt status expressed in the law, all mineral rights, water rights, and other rights which are rights and benefits that are individual in nature and are all valuable property rights protected to the claimant under the fifth and fourteenth amendments to the United States Constitution. See: Choate v. Trapp, 224 U. S. 413 (1912); Cramer v. United States, 261 U. S. 219 (1923); U. S. v. Payne, 264 U.S.446 (1924); United States v.Arenas, 9th Cir. 158 F. 2d,730 (1946; McKay v.Kalyron, 204 U.S. 248, 468 (1907); United States v. Holliday, 3 Wall 407, 419 (p.497); Leecy v. U. S.(CCA 8) 190 F. 289; Jones v. Meehan, 1889 - 175 US 1; and Bryan v. Itasco County, Minn. Decided June 14, 1976.

Therefore, I hereby give notice as aforesaid in the title of this instrument and notice as to specific lands selected in allotment: which are legally described as follows:

NW 1/4 SECTION 1, TWP 23 S., R. 63 E., MT. DIABLO MERIDIAN NEVADA TO INCLUDE THE PUBLIC DOMAIN WITH ALL WATER AND MINERAL RIGHTS AND INDIAN TAX EXEMPTIONS WITHIN THE 160.00 ACRES HEREIN DESCRIBED EXCEPT ANY NOW VALID EXISTING EASEMENTS.

The aforesaid claimant is an Indian citizen ( 8 USC 1401) living separate and apart from his or her tribe but retains the right to share in all tribal and other property which includes certain basic occupancy rights as an American Indian.

I further certify that I am holding said lands openly and notoriously in hostile to all the world and have posted same against all trespassers and that I have drawn this instrument for the purposes therein contained, and for purposes of being recorded, checked, indexed and abstracted.

PLAINTIFF'S
EXHIBIT
24
80-140 or

BOOK 942                                            801139

SEE: Reports of the American Indian Policy Review Commission, a joint congressional investigating body established pursuant to Public Law 93-580; the language of PL 93-580 and the declaration of congressional policy contained in the Indian Financing Act of 1974 (P.L. 93-262; 88 Stat. 77); and Indian Determination Act, etc. THE PRIVACY ACT OF 1974 C43CFR2.48(d).

/S/ ................................ DATED ......... 1978

CLAIMANT VICKIE LYNN FOLSOM LAMB

RIGHT THUMB PRINT OF ABOVE SIGNED CLAIMANT

STATE OF OKLAHOMA              }
                              } ss
COUNTY OF CLEVELAND            }

This is to certify that the above signed affiant personally has appeared before me, a Notary Public, and has affixed the signature and right thumb print to the within instrument, before me and has first been duly sworn and has stated that the within instrument contains the truth, to the best of affiants knowledge and belief and that it has been drawn for the purposes therein contained and for purposes of recording, being abstracted, checked and indexed in the official records of the county named therein where the lands claimed are located. To which I affix my hand and official seal this Eighth day in September 19 78

/S/ Christine C West

NOTARY PUBLIC

My Commission Expires March 29 1982

(End — Page Two )

INST NO 901139
CFN                        942

Vickie L. F. Lamb
SEP 11 2    '78

FEE        DEPUTY